UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RHONDA STETSON,<br><br>  Plaintiff,<br><br>  v.<br><br>ANDREW SAUL, Commissioner of Social Security,<br><br>  Defendant. | No. 1:19-cv-00313-GSA<br><br>**ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF COMMISSIONER OF SOCIAL SECURITY AND AGAINST PLAINTIFF** |

### I.  Introduction

Plaintiff Rhonda Stetson ("Plaintiff") seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for supplemental security income pursuant to Title XVI of the Social Security Act.  The matter is currently before the Court on the parties' briefs which were submitted without oral argument to the Honorable Gary S. Austin, United States Magistrate Judge.[1]  *See* Docs. 15, 16 and 17.  Having reviewed the record as a whole, the Court finds that the ALJ's decision is supported by substantial evidence and applicable law.  Accordingly, Plaintiff's appeal is denied.

///

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  *See* Docs. 7 and 8.

## II. Procedural Background

On April 16, 2015, Plaintiff filed an application for supplemental security income alleging disability beginning February 23, 2014. AR 23. The Commissioner denied the application initially on June 10, 2015 and following reconsideration on November 13, 2015. AR 23.

On December 15, 2015, Plaintiff filed a request for a hearing. AR 23. Administrative Law Judge Ruxana Meyer presided over an administrative hearing on September 11, 2017. AR 56-80. Plaintiff appeared and was represented by an attorney. AR 56. On January 17, 2018, the ALJ denied Plaintiff's application. AR 23-33.

The Appeals Council denied review on March 1, 2019. AR 4-10. On May 6, 2019, Plaintiff filed a complaint in this Court. Doc. 1.

## III. Factual Background

### A. Plaintiff's Testimony and Reports

Plaintiff (born February 1960) lived in an apartment with her daughter, son-in-law and four grandsons aged ten to eighteen. AR 60. After dropping out of high school, Plaintiff resumed her education and completed a GED, an associate degree in business management and criminology/corrections, and a certification in medical administration (billing and coding). AR 63.

Plaintiff last worked performing home care for her late fiancé during his final illness. AR 63. After her fiancé died, Plaintiff cared for another individual but was discharged when her own medical care resulted in excessive absences. AR 63-64. While Plaintiff pursued a bachelor's degree from CSU-Fresno from 2003 to 2006, she did office work as a work-study student. AR 64-65.

Plaintiff stopped driving in March 2017, when her headaches were "really bad" and her vision was distorted. AR 61. Thereafter, Plaintiff consulted an ophthalmologist who performed laser surgery to reduce the pressure in her eyes. AR 62, 72-73.

Plaintiff experienced back and leg pain and constant severe headaches. AR 67-68. Plaintiff's medications reduced her headache pain, but if Plaintiff did not feel well in the morning she was unable to take her medication and her headache was constant. AR 62-63. Plaintiff

2

described several types of headaches, including a "soft" headache that was sometimes present when she awoke, and a "sledgehammer," accompanied by dizziness and nausea that sent her to bed in the dark for its duration. AR 69. Sometimes the headache produced a sensation akin to her brain swelling in her head. AR 69. She also experienced bright lights (visual aura) and a sensation like icepicks piercing her head. AR 71. Neck tightness and pain sometimes accompanied the headaches. AR 71.

Plaintiff estimated that she could sit for ten or fifteen minutes before needing to change position. AR 68. She could stand for twenty to thirty minutes. AR 68. She could walk about twenty minutes before experiencing pain in her legs and feet. AR 68. She avoided climbing stairs. AR 71. Plaintiff thought she could lift about ten pounds. AR 68. She could not lift a full laundry basket, but could push it with her foot if her daughter or a grandson was not available to help her. AR 69.

On a typical day Plaintiff arose at about 6:30 a.m., started coffee and woke her three youngest grandsons for school. AR 66. After her daughter and grandsons left for the day Plaintiff had coffee, took her medications and relaxed until her medications took effect. AR 66. Plaintiff would then load the dishwasher and do a load of laundry. AR 66. Although Plaintiff could not bend to pick up dirty laundry throughout the apartment, her daughter collected it in a basket and put it near the washing machine within Plaintiff's easy reach. AR 66. Plaintiff would then take a walk to check for mail, have lunch and take her mid-day medications. AR 66. Because her medications caused drowsiness, Plaintiff took a nap in the early afternoon before arising to prepare a snack for her grandsons when they returned from school. AR 66-67. Plaintiff was usually in bed by ten or eleven o'clock. AR 67.

On May 13, 2015, Plaintiff completed a headache questionnaire, AR 216-17. Plaintiff reported that her last four headaches had been the prior four days, explaining that the headaches never stopped. AR 216. She explained that her headaches were painful ("like someone hit me with a baseball bat") and accompanied by dizziness, nausea, vomiting and nose bleeds. AR 216. Her medications included Topiramate, Naproxen and Sumatriptan Succinate. AR 217. Plaintiff could not drive when taking her medications. AR 217.

Plaintiff reiterated her headache symptoms in an adult function report. AR 219-26. Plaintiff tried to do housework and keep appointments despite her headache pain but was unable to enjoy her former active lifestyle. AR 220. Unless she was incapacitated, Plaintiff also tried to prepare healthy meals, sweep and do the dishes and laundry. AR 221. She shopped for groceries and household products twice monthly with help. AR 222. She watched movies and did arts and crafts. AR 223. Her illness affected her ability to walk, climb stairs, bend, stand, reach, talk, remember and concentrate. AR 224.

### B. Medical Records

In February 2014, Plaintiff saw Jessie Sumner, PA-C, with complaints of headache and neck pain. AR 298-300. Ms. Sumner diagnosed neck strain and cervicalgia and prescribed Cyclobenzadrine Hydrochloride and Naprosyn (naproxen). AR 299. The administrative record includes Ms. Sumner's treatment notes through March 2015. AR 335-45, 352-55, 360-72

In March 2014, Ms. Sumner referred Plaintiff for physical therapy for her neck pain. AR 304-12, 323-29. On intake, Plaintiff reported moderate pain, frequent severe headaches, difficulty concentrating and moderately disturbed sleep. AR 307. However, she was still able to look after herself, lift heavy weights, but with pain; do her usual work but no more; drive with slight neck pain; and, read with moderate neck pain. AR 307. Most recreational activities were painful. AR 307. Hot showers mitigated the pain. AR 308, 311. Wayne Troxell, D.P.T., noted reduced motion of the cervical spine and reduced strength (4-/5). AR 311. Dr. Troxell diagnosed chronic neck pain and cervicogenic headaches with noted trigger points, myofascial dysfunction and poor posture. AR 312. The doctor recommended therapeutic exercise, postural training, home exercise and stretching, mechanical traction and manual therapy for joint and soft tissue mobilization, inhibition of muscle ton/spasm and normalization of tissue extensibility. AR 312. In early April 2014, when Plaintiff had no further authorized visits, Dr. Troxell discharged Plaintiff although her condition had not improved with therapy. AR 323.

In May 2014, Ms. Sumner noted symptoms of ataxia, prescribed Topamax and referred Plaintiff for a neurology evaluation. AR 336. Plaintiff's insurer denied coverage for a CT scan of the head. AR 337. In June 2014, Plaintiff reported severe photophobic pain. AR 339. By July

2014, Plaintiff reported dizziness, nausea and a visual aura before the onset of a headache. AR 342. In August, Plaintiff reported increased tension and aura before a headache. AR 344. At Plaintiff's annual physical examination in December 2014, Ms. Sumner noted that Plaintiff had multiple chronic illnesses including asthma, a functional murmur and diabetes.[2] AR 352.

Beginning in July or August 2015, Plaintiff transferred her treatment to Family Health Services. AR 400-08, 462-511. Eliezar Alvarez, P.A., noted that Plaintiff was not then under the care of a neurologist. AR 400. Plaintiff's A1C was very high. AR 404. Family Health Services continued Ms. Sumner's practice of giving Plaintiff a Toradol (Keterolac) injection to relieve severe headache pain that had continued for multiple days. AR 405-06, 408-09. On August 25, 2015, David Cheyney, D.O., reviewed an MRI of Plaintiff's brain and found it to be normal with no evidence of acute neurologic process. AR 410.

Beginning in November 2015, Michael Alan Medeiros, M.D., treated Plaintiff's headaches. AR 505-11. Dr. Medeiros noted that Topamax reduced the severity of Plaintiff's headaches but she could not tolerate Elavil. AR 505. Plaintiff was also taking Zoloft, an antidepressant, and Zofran for nausea. AR 505.

In spring and summer 2016, David B. Kaye, M.D., treated Plaintiff for anatomical narrow angle glaucoma. AR 445-61. In June 2016, Dr. Kaye performed laser peripheral iridotomy.[3] AR 445.

Beginning in February 2017, Dolores Davis, F.N.P., treated Plaintiff for left knee pain and a knot behind the knee. AR 466-68, 472-500.

Beginning in April 2017, Henry Kang, M.D., Bruce Noyes, PA-C, and Charles Mackey, PA-C, treated Plaintiff for cervical upper back pain and intractable headache. AR 464-65, 469-98. In June 2017, Dr. Kang diagnosed cervical disc disease; spondylosis of the cervical region

///

///

---

[2] Test results in the Ms. Sumner's notes consistently showed Plaintiff's blood glucose to be well controlled.

[3] Laser peripheral iridotomy is a medical procedure which uses a laser device to create a hole in the iris, thereby allowing aqueous humor to traverse directly from the posterior to anterior chamber of the eye, thus relieving the pupillary block of anatomical narrow angle glaucoma. https://eyewiki.aao.org/Laser_Peripheral_Iridotomy (accessed April 8, 2020).

without myelopathy or radiculopathy; and, cervical spine stenosis.[4] AR 464.  Dr. Kang prescribed Mobic and Norco, and continued Plaintiff's Baclofen prescription.  AR 464, 469.

### IV.  Standard of Review

Pursuant to 42 U.S.. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits.  "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).  Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a scintilla, but less than a preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted).  When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision.  *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

### V.  The Disability Standard

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).

---

[4] The record includes no spinal imaging from which Dr. Kang could have evaluated the existence or severity of degenerative disc disease.  Included within the evidence Plaintiff presented to the Administrative Council for review (*see* Section VIII below) is a report of lumbar spinal x-rays dated October 25, 2017.  AR 44.  After reviewing the x-rays, Jeffrey Child, M.D., reported mild multilevel spondylosis; mild bilateral multilevel facet osteoarthritis; and grad 1 L4-L5 anterolisthesis, most probably due to spondylosis and facet osteoarthritis.  AR 44.

> An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled. 20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. § 416.920(a)-(f).

### VI.     Summary of the ALJ's Decision

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date of April 16, 2015. AR 26. Her severe impairments included chronic migraines and diabetes mellitus. AR 26. None of the severe impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926). AR 28.

The ALJ concluded that Plaintiff had the residual functional capacity to perform the full range of at all exertional levels subject to environmental conditions including no more than an occasional exposure to light brighter than that found in an indoor work environment, and no concentrated exposure to more than moderate noise, flashing lights or hazards such as moving machinery and unprotected heights. AR 28.

Plaintiff had no past relevant work. AR 32. Considering Plaintiff's age, education, work experience and residual functional capacity, significant numbers of jobs that Plaintiff could perform existed in the national economy. AR 32. Accordingly, the ALJ found that Plaintiff was not disabled at any time from April 16, 2015, the application date, through January 17, 2018, the date of the decision. AR 33.

### VII. Sufficient Evidence Supported the Residual Functional Capacity Determination

Although Plaintiff does not challenge the ALJ's determination at step two that her only severe impairments were chronic migraine headaches and diabetes mellitus, Plaintiff contends that the ALJ erred in failing to incorporate work-related limitations in Plaintiff's residual functional capacity consistent with degenerative disc disease and Dr. Van Kirk's opinion. The Commissioner responds that the ALJ set forth valid reasons for rejecting Dr. Van Kirk's opinion.

#### A. Medical Opinions

##### 1. Agency Physicians

On initial review in June 2015, G. Taylor, M.D., opined that Plaintiff had no exertional, postural, manipulative, visual or communicative limitations but needed to avoid concentrated exposure to noise and hazards. AR 85-86. On reconsideration in September 2015, G. Bugg, M.D., agreed with Dr. Taylor's opinion. AR 98.

##### 2. Consultative Psychiatric Evaluation

On October 30, 2015, psychologist Mary Lewis, Psy.D., conducted a comprehensive psychiatric evaluation at the agency's request. AR 425-30. Dr. Lewis diagnosed only nicotine dependence and found no significant psychological impairment. AR 429-30.

##### 3. Consultative Orthopedic Evaluation

On July 9, 2017, Dale H. Van Kirk, M.D., performed a comprehensive orthopedic evaluation of Plaintiff. AR 439-43. Dr. Van Kirk noted that Plaintiff's chief complaints were

neck pain with radiation down both arms, and lower back pain with radiation down both legs. AR 439. However, the doctor noted that claimant associated her neck and back pain with her chronic headaches. AR 439. Current medications included Gabapentin, Mobic, Norco, Sertraline, Baclofen and Ibuprofen. AR 440.

In the course of the examination Plaintiff was able to sit comfortably in a chair, get up and out of the chair, walk around the examination room, and get on and off the examination table. AR 441. Plaintiff's Romberg test and walking with one foot in front of the other indicated that Plaintiff had abnormal balance. AR 441. She had no limp. AR 441. Plaintiff was able to squat only about halfway before experiencing pain. AR 441.

Plaintiff had generalized discomfort and slightly limited range of motion of the cervical spine. AR 441. She had pain in the mid-lumbar region that radiated into her hips and buttocks. AR 441. Straight leg raising, motor strength, sensation and reflexes were normal. AR 442.

Dr. Van Kirk diagnosed chronic cervical and lumbosacral musculoligamentous strain/sprain likely associated with degenerative disc disease. AR 442. He opined that Plaintiff was able to stand and/or walk cumulatively six hours in an eight-hour workday and had no limitation on sitting. AR 442. She was able to lift and carry twenty pounds occasionally and ten pounds frequently. AR 442. She was limited to occasional postural activities but should never crouch, crawl or balance. AR 443. She should avoid cold or damp environments and should not work at unprotected heights. AR 443. Following his evaluation, Dr. Van Kirk prepared a medical source statement consistent with the opinion expressed in the examination report dated July 19, 2017. AR 433-38.

### B. **Determining Residual Functional Capacity**

"Residual functional capacity is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."

SSR 96-8p. The residual functional capacity assessment considers only functional limitations and restrictions which result from an individual's medically determinable impairment or combination of impairments. SSR 96-8p.

A determination of residual functional capacity is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner. See 20 C.F.R. §§ 404.1527(d)(2) (residual functional capacity is not a medical opinion), 404.1546(c) (identifying the ALJ as responsible for determining residual functional capacity). "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity." *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001). In doing so the ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995).

"In determining a claimant's [residual functional capacity], an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins*, 466 F.3d at 883. *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings." *Magallanes v, Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

The opinions of treating physicians, examining physicians, and non-examining physicians are entitled to varying weight in residual functional capacity determinations. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. *Id.*; *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996). The opinion of an examining physician is,

in turn, entitled to greater weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990). An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a contradicted opinion of a treating professional may be rejected for "specific and legitimate" reasons. *Id.* at 830. However, the opinions of a treating or examining physician are "not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).

### C. The ALJ Properly Analyzed Evidence in the Record as a Whole

"[A]n ALJ is responsible for determining credibility and resolving conflicts in medical testimony." *Magallanes*, 881 F.2d at 750. An ALJ may choose to give more weight to opinions that are more consistent with the evidence in the record. 20 C.F.R. §§ 404.1527(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion").

As noted above, Plaintiff does not contest the ALJ's determination at step two that degenerative disc disease was not a severe impairment. Noting that the only evidence on Plaintiff's alleged degenerative disc disease (and depression, which is not at issue before this Court) was Plaintiff's reported symptoms and her physicians' assumptions, the ALJ wrote:

> A medically determinable impairment may not be established solely based on symptoms alone, or on the claimant's allegations regarding symptomology (20 CFR 416.922 and SSR 96-1p). There must be evidence from an acceptable medical source to establish the existence of a medically determinable impairment. Here, there were no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment. Accordingly, the undersigned finds there was a lack of objective evidence to substantiate the existence of aa medically determinable impairment.

AR 27-28.

At step four, the ALJ observed that Plaintiff's activities of daily living were inconsistent with Plaintiff's representation of the intensity, persistence and limiting effect of her alleged

impairments. AR 30. The ALJ noted that Plaintiff managed her own personal hygiene, did household chores, watched television, took walks, prepared meals, shopped, managed her personal finances and used public transportation. AR 30.

In addition, Plaintiff's medical records revealed only routine and conservative treatment, consisting primarily of medication. AR 30. Side effects from medication were not so severe as to interfere with Plaintiff's performing work consistent with her residual functional capacity. AR 31. Objective findings such as imaging studies, laboratory tests, physical performance and strength assessments, prescriptions and surgical evaluations suggested the Plaintiff's impairments were not as severe as alleged. AR 30. The records references a single referral to a neurologist, but includes no reports of findings or treatment associated with the consultation. AR 30-31. The ALJ gave significant weight to all expert opinions that Plaintiff had environmental limitations associated with her headaches. AR 31.

Similarly, the ALJ gave little weight to Dr. Van Kirk's opinion finding that it was based largely on Plaintiff's reported subjective symptoms and was inconsistent with the objective evidence and the record as a whole. AR 31. The record supports the ALJ's findings. Although Plaintiff applied for supplemental security income in April 2015, her physicians did not seriously contemplate a possible diagnosis of degenerative disc disease until June 2017, when Dr. Kang diagnosed cervical disc disease; spondylosis of the cervical region without myelopathy or radiculopathy; and, cervical spine stenosis. AR 464. However, no imaging studies or other objective measures to support Dr. Kang's diagnosis were included in the administrative record until after issuance of the hearing decision. Even though Dr. Van Kirk wrote that Plaintiff's "chronic cervical and lumbosacral musculoligamentous strain/sprain [was] likely associated with degenerative disc disease," his opinion acknowledged a lack of documentation to support a diagnosis of degenerative disc disease. AR 442.

The Court is not required to accept Plaintiff's characterization of her treatment records or her assessment of the medical opinions. The ALJ fully supported her determination based on multiple medical opinions and the evidence of record. Even if this Court were to accept that the record could support Plaintiff's position, the record amply supports the ALJ's interpretation as

well. When the evidence could arguably support two interpretations, the Court may not substitute its judgment for that of the Commissioner. *Jamerson*, 112 F.3d at 1066.

### VIII. The Appeal Council Properly Concluded that New Evidence Would Not Change the Outcome of Plaintiff's Claim

Plaintiff also contends that the Administrative Council erred in determining that additional evidence submitted as part of her request for review did not show a reasonable probability that it would change the outcome of the hearing decision. The Commissioner counters that the Administrative Council determination is not subject to judicial review.

The Social Security Act grants district courts jurisdiction to review only final decisions of the Commissioner. 42 U.S.C. § 405(g); *Klemm v. Astrue*, 543 F.3d 1139, 1144 (9th Cir. 2008). An Administrative Council denial of a request for review is a non-final agency action not subject to judicial review because when review is denied, the ALJ's decision becomes the final decision of the Commissioner. *Taylor v. Commissioner of Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011).

No later than five business days before the date of the hearing a claimant must submit all written evidence to the administrative law judge who will conduct the hearing in the claimant's case. 20 C.F.R. § 416.1435(a). The ALJ may also accept information after the five-day deadline prior to issuing the hearing decision under circumstances enumerated in 20 C.F.R. § 416.1435(b). Late submission of written information is commonly addressed at the administrative hearing where the claimant's attorney and the ALJ agree to a mutually agreeable time in which specific written documentation may be provided to the ALJ. At the hearing in this case, Plaintiff's attorney indicated that the record was complete and that he was not aware of any missing evidence. AR 58-59.

In limited circumstances, a claimant may submit new and material evidence to the Administrative Council. 20 C.F.R. § 416.1470(a)(5). The Council must consider that evidence in

determining whether to review the ALJ's decision, provided the evidence: (1) relates to the period on or before the ALJ's decision; (2) there is reasonable probability that the additional evidence would change the outcome of the decision; and, (3) the claimant has established good cause for not complying with the requirements of 20 C.F.R. § 416.1435. *Id.* Regulatory bases for establishing good cause include: (1) the agency action misled the claimant; (2) the claimant had physical, mental, educational or linguistic limitations that prevented the claimant from informing the Commissioner or submitting the evidence earlier; or, (3) an unusual, unexpected or unavoidable circumstance beyond the claimant's control prevented the claimant from informing the Commissioner or providing the evidence earlier. 20 C.F.R. § 416.1470(b). Unusual, unexpected or unavoidable circumstances may include such things as serious illness of the claimant; death or serious illness in the claimant's family; destruction or damage of records; receipt of evidence after the hearing despite the claimant's active and diligent efforts to secure it earlier; or, receipt of a hearing decision on the record and the Administrative Council's review of that decision. 20 C.F.R. § 416.1470(b)(3).

Defendant contends that in this case Plaintiff failed to establish good cause for her failure to submit the additional evidence to the ALJ before he rendered his decision. When Plaintiff's attorney submitted the additional records (Plaintiff's post-hearing medical records from Madera Community Hospital and Family Services, dated September 13, 2017 through March 21, 2017 (AR 40-51)) to the Administrative Council on June 27, 2018, he stated that the new evidence was "unavailable to the ALJ prior to the decision," but offered no explanation for the records' unavailability.[5]  AR 39.

---

[5] On June 7, 2018, Plaintiff also sought to introduce additional records (Dr. Medeiros' treatment notes dated November 12, 2015) stating that the new evidence was "unavailable to the ALJ prior to the decision," but offering no explanation for the records' unavailability. AR 52. Plaintiff does not appeal the Administrative Council's determination not to consider these documents. *See* Doc. 15 at 7, 12 (specifying the documents in issue appear at AR 39-51). The Administrative Council declined to address the November 2015 treatment notes, which were already included in the record at AR 505-07. AR 5.

The claimant has the burden to satisfy the good cause requirement before the Administrative Council is required to review a case when a Plaintiff submits new evidence not provided to the ALJ. *See Baptista v. Comm'r of Soc. Sec. Admin.*, 2019 WL 4596771 at *9 (E.D. Cal. Sept. 23, 2019) (No. 1:18-cv-00844-JLT); *Schenone v. Saul*, 2019 WL 2994492 at *7 (E.D. Cal. July 9, 2019) (No. 2:18-cv-01655-AC); *Norbert S. v. Berryhill*, 2019 WL 2437457 at *10 (D. Or. June 11, 2019) (No. 6:18-cv-00218-AC).   When the claimant fails to establish good cause, a district court properly declines to remand the action for further proceedings. *See Baptista*, 2019 WL 4596771 at *9; *Schenone*, 2019 WL 2994492 at *7-8.

In this case, Plaintiff failed to contend that the evidence met any of the bases for good cause set out in 20 C.F.R. § 416.1435(b).  Accordingly, the Court declines to remand based on the Administrative Council's determination not to review the post-hearing records.

### IX.   Conclusion and Order

Based on the foregoing, the Court finds that the ALJ's decision that Plaintiff is not disabled is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is directed to enter judgment in favor of Defendant Andrew Saul, Commissioner of Social Security, and against Plaintiff Rhonda Stetson.

IT IS SO ORDERED.

Dated:   **April 15, 2020**                 **/s/ Gary S. Austin**
                                   UNITED STATES MAGISTRATE JUDGE